IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GERALD DALRYMPLE,

        Plaintiff,

v.

PROTECTIVE LIFE INSURANCE
COMPANY, INC.,

        Defendant.

CIVIL ACTION NO.

1:05-CV-01774-JEC

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 2 6 2007

JAMES N. HATTEN,
By. _____

## ORDER & OPINION

This case is presently before the Court on defendant's Motion for Summary Judgment [15] and plaintiff's Motion for Summary Judgment [22]. The Court has reviewed the record and concludes that defendant's Motion for Summary Judgment [15] should be **GRANTED** and plaintiff's Motion for Summary Judgment [22] should be **DENIED**.

## BACKGROUND

### I.  Procedural Background

Plaintiff filed a Complaint in the Superior Court of Cherokee County, Georgia, seeking to recover under an insurance policy allegedly issued by defendant, Protective Life Insurance Company, Inc. ("defendant" "Protective Life") (Compl. [1-1]). Defendant thereafter removed the case to this Court ("Notice of Removal" [1-

1]).  Defendant has now filed a Motion for Summary Judgment ("Def.'s Mot. for Summ. J." [15]), as has plaintiff ("Pl's Mot. for Summ. J." [22]).  Both motions for summary judgment ask the Court to decide the same basic issue of law: to wit, whether plaintiff is entitled to a benefit allegedly due to him under a policy of insurance or Conditional Receipt Agreement issued on behalf of his mother, Nila Herndon ("Herndon" the "Applicant").  Because both motions ask the Court to decide the same issue and there are no genuine disputes of material fact, the Court will consider them together.

## II.  **Factual Background**

Plaintiff brings this action for insurance benefits he claims due to him under an insurance policy and/or Conditional Receipt Agreement allegedly issued by defendant, Protective Life Insurance Company, Inc. ("Compl." at ¶¶ 4-7.)

### A.  **Plaintiff's Medical History**

On July 25, 2000, Herndon and her husband were stopped on Pennyrile Parkway, a road just outside of Hopkinsville, Tennessee, when the vehicle her husband was driving, and in which she was passenger, was struck from behind by a tractor-trailer going approximately seventy to eighty miles per hour.  ("Dalrymple Dep." [17] at 34:21-23; 35:11-36:21.)  The force from the accident killed Herndon's husband, (*Id.* at 36:23-24) and threw Herndon from the vehicle onto a concrete barrier, causing her to suffer a skull

2

fracture, multiple fractures, and bilateral collapsed lungs. (Dalyrmple Dep. at 37:15-39:1; Covington Dep. [18] at 12:9-19; "December 11, 2002 Initial Visit Dictation" attach. as Ex. 1 to Covington Dep. at 1.)  Herndon was life-flighted to Jennie Stuart Medical Center and then to Vanderbilt Medical Center.  (Defendant's Statement of Undisputed Facts "DSMF" [15] at ¶ 12[1]; Dalyrmple Dep. at 37:3-7; "December 11, 2002 Initial Visit Dictation" attach. as Ex. 1 to Covington Dep. at 1.)

Herndon underwent extensive surgery at Vanderbilt, which Dr. Covington described as "virtually rebuild[ing] her."  (DSMF at ¶ 14; "Discharge Summary" attach. as Ex. 7 to Covington Dep.)  The accident caused Herndon to suffer a "a right leg fracture and some ischemic/injured bowel, lacerated liver, skull and sinus fracture, bilateral collapsed lungs, vertebral fractures, and lost vision of the left eye."  (December 11, 2002 Initial Visit Dictation attach. as Ex. 1 to Covington Dep. at 1.)  The accident also caused paralysis. (DSMF at ¶ 15[2]; Dalrymple Dep. at 34:11-15; Covington Dep. at 13:10-

---

[1]  Plaintiff provides no response to this particular statement by defendant.  The Court will deem as admitted all statements made by defendant to which plaintiff provided no response.  *See* L.R. 56.1B(2)(a)(2).

[2]  Plaintiff disputes this fact without citation to evidence. Under Local Rule 56.2(B)(2)(a)(2), the Court deems admitted any fact controverted by plaintiff for which plaintiff does not provide any supporting evidence.

3

15; 29:12-19.)  While receiving care at Vanderbilt, Herndon developed a decubitus (pressure sore) on her left buttock.  (DSMF at ¶ 17; Dalyrmple Dep. at 31:7-23; Covington Dep. at 18:18-19:8.)  Herndon was also diagnosed with, and received medication for depression. (DSMF at ¶ 20[3]; Covington Dep. at 16:5-9; December 11, 2002 Initial Visit Dictation attach. as Ex. 1 to Covington Dep. at 3; "January 3, 2003 Home Visit Dictation" attach. as Ex. 2 to Covington Dep. at 3.)

On September 16, 2003, Herndon visited Jennie Stuart Medical Center.  Dr. Covington thought the emergency room evaluation revealed "significant urinary tract infection" ("September 16, 2003 History and Physical Dictation" attach. as Ex. 6 to Covington Dep. at 1) and diagnosed her with recurrent urinary tract infections.  (Covington Dep. at 54:21-22.)  Dr. Covington also diagnosed Herndon with anemia at this time.  (Id.; September 16, 2003 History and Physical Dictation attach. as Ex. 6 to Covington Dep. at 3.)  While hospitalized at Jennie Stuart, Herndon went into respiratory distress and was placed on a ventilator.  ("October 1, 2003 Discharge Summary Dictation" attach. as Ex. 7 to Covington Dep. at 1.)

---

[3]  Plaintiff disputes this fact as "misleading," but does not offer any supporting evidence for this position or any reference to a separate statement of undisputed material facts.  The Court deems this fact as admitted under LR 56.1B(2)(a)(2) (in order to refute a fact, non-movant must offer "specific citations . to evidence (including page or paragraph number.") and LR 56.1B(2)(b) (to establish additional undisputed material facts, a non-movant must file a separate statement conforming to LR 56.1B(1)).

4

AO 72A
(Rev.8/82)

On October 1, 2003, Jennie Stuart Medical Center transferred Herndon to Vanderbilt hospital because the Vanderbilt facility could provide more "advanced care." ("October 1, 2003 Discharge Summary Dictation" attach. as Ex. 7 to Covington Dep. at 1.) The doctors at Vanderbilt performed a colostomy, a procedure in which a portion of the colon is pulled out through the abdominal wall to drain into a bag. (Covington Dep. at 39:5-21; "January 28, 2004 Home Visit Dictation" attach. as Ex. 8 to Covington Dep. at 2.) On February 2, 2004, Herndon was hospitalized for twenty-three hours in order to receive a transfusion for anemia. ("February 2, 2004 History and Physical Dictation" attach. as Ex. 10 to Covington Dep. at 1.)

On March 5, 2004, Covington had a conversation with Phyllis Dunlap, Herndon's daughter, in which he and Ms. Dunlap discussed keeping Herndon at home as she was most likely at the end of her life. ("March 5, 2004 Telephone Dictation" attach. as Ex. 12 to Covington Dep.) In April 2004, Dr. Covington believed that Herndon might not recover from her medical problems. ("April 5, 2005 Telephone Dictation" attach. as Ex. 13 to Covington Dep. at 1.) Herndon died on April 11, 2004. (Compl. at ¶ 7.)

## B. **The Application for Life Insurance**

In December 2003 or January 2004, Mr. Dalrymple ("plaintiff" "Dalrymple") submitted an application for a life insurance policy (the "Application") on behalf of Nila Herndon, plaintiff's mother,

("Herndon" the "Applicant") with defendant, Protective Life.  (DSMF at ¶¶ 1, 33; Dalrymple Dep. at 7:24-8:1; 11:14-18; 14:6-18; 53:9-22.) Plaintiff filled out most of the paperwork for the Application, and wrote the check for the accompanying premium.  (DSMF at ¶ 34; Dalrymple Dep. at 11:14-24.)  The Application lists plaintiff as the primary beneficiary, and his wife, Deana Dalrymple, as the secondary beneficiary.  ("Application" attach. as Ex. 1 to Dalrymple Dep. at 2; Dalrymple Dep. 47:12-15; DSMF at ¶¶ 36-37.)

On page three of the Application, plaintiff and Herndon provided information regarding plaintiff's medical history.  (Application attach. as Ex. 1 to Dalrymple Dep. at 3; Dalyrmple Dep. at 48:22-51:1; DSMF at ¶ 44.)  Specifically, Box Two of the Application inquired whether any proposed person for insurance has:

> within the past 10 years...been treated or diagnosed by a physician as having: (a) Disorder of brain or spinal cord, paralysis, mental disorder, epilepsy, stroke, convulsions, chronic headaches, (b) Asthma, bronchitis, emphysema, tuberculosis or other disorder of the lungs or respiratory system, (c) High blood pressure, heart attack, heart murmur, chest pain or other disorder of the heart or blood vessels, (d) Any disorder of the esophagus, stomach, intestines, liver or pancreas, (e) Sugar or blood in the urine, chronic inflammation or other disorder of the kidneys, (f) Cancer, tumor or disorder of the prostate or reproductive organs, (g) Arthritis, osteoporosis or other disorder of the muscles, skin or bones including joints or spine, (h) Diabetes, recurrent infections, enlarged lymph glands, anemia, excess fatigue or other disorders of the glandular or blood systems.  (Application at 3.)

6

Based on information provided by Ms. Herndon, plaintiff placed "x's" in the boxes falling under the column titled "No," indicating that Herndon did not suffer from any of the illnesses and/or disorders listed under: (a), (b), (c), (d), (e), (f), or (h).   (*Id.*)

When plaintiff originally submitted the Application, he signed it.   (Dalrymple Dep. at 53:13-54:2.)   After submission of the Application, plaintiff and Herndon were told they needed to re-sign the declarations page.   (DSMF at ¶ 39; Dalrymple Dep. at 54:4-10.) Plaintiff and Herndon signed the declarations page, and plaintiff mailed it back.   (DSMF at ¶ 40; Dalrymple Dep. at 55:15-19; 57:25-58:4.)   Plaintiff signed as a witness to the Application and Herndon signed as the applicant.   (DSMF at ¶ 41; Dalrymple Dep. at 59:1-8; "Declarations Page" attach. as Ex. 1 to Dalrymple Dep. at 4.)   The declarations page states that "It is understood and agreed that: (a) All such statements and answers shall be the basis of any insurance issued, and my (our) answers are material to the decision as to whether the risk is accepted by Protective Life." (Declarations Page attach. as Ex. A to Tyson Decl. at A-7.)

Herndon also signed a Conditional Receipt Agreement ("CRA") on January 1, 2004 ("CRA" attach. as Ex. C to Declaration of Arthur Tyson "Tyson Decl." [24]).   The CRA provides for "a limited amount of insurance, for a limited period of time," if all the terms and conditions of the CRA are met. (*Id.*)   According to the CRA, insurance

7

may become effective prior to policy delivery if, *inter alia*, "the Proposed Insured(s) has/have completed all examinations and/or tests requested by the Company." (*Id.*) The "Effective Date" under the CRA is defined as the "latest of: (A) the date of the application; (B) the date requested in the application; or (C) the date of the last of any medical examinations or tests required under the rules and practices of the Company." (*Id.*)

After Herndon's death, plaintiff sought to recover benefits under the Application for life insurance he and his mother had submitted in December 2003 or January 2004. ("September 15, 2004 Letter re: Denial of Coverage" attach. as Ex. A to Tyson Decl. at A-1.) Defendant declined plaintiff's claim because Herndon died before she had the required medical examinations under the CRA and because a review of Herndon's medical history, much of which had not been disclosed on the Application, indicated that no insurance would have been issued under any circumstances. (*Id.*) Plaintiff now seeks insurance benefits that he claims are due to him under the Insurance Application or CRA submitted on behalf of his mother, Nila Herndon.

8

## DISCUSSION

**I.    Plaintiff's Claim for Benefits under the Alleged Insurance Policy**

### A.    Plaintiff May Not Recover under the Insurance Policy Because Defendant, Protective Life, Issued No Insurance Policy

Plaintiff may not recover under an alleged policy issued by defendant in consequence of the Application because the record indicates that plaintiff's decedent died before any policy issued. Contrary to plaintiff's argument, neither an insurer's delay in passing on an application nor its acceptance of premiums creates a binding obligation upon the insurer. *See Protective Life Ins. Co. Inc. v. Robinson*, 193 Ga. App. 316, 317 (Ga. App. 1989); *Peterson v. Liberty Mutual Ins. Co.*, 188 Ga. App. 420, 422-23 (Ga. App. 1988) ("'(t)he general rule is that an application for insurance, even with the concurrent prepayment of premiums, creates no binding contract of insurance until the insurer manifests its acceptance.'") (internal citation and quotation omitted); *Robertson v. Life Ins. Co. of Ga*, 196 Ga. App. 294, 294 (Ga. App. 1990) (an application for insurance is a mere offer, and where company does not act upon insurance, only accepts concurrent payment of premium with application, and proposed insured dies prior to acceptance of the Application, the company incurs no liability).   Here, there is no evidence that Protective Life accepted the Application.   Protective Life neither issued a

9

policy nor indicated in any other manner that it had accepted Herndon's Application for insurance.   The mere acceptance of a premium by Protective Life is not sufficient to create a contract of insurance.  Because the Court finds no genuine issue of material fact as to the existence of a valid contract for insurance, plaintiff may not recover under any alleged insurance policy issued by Protective Life.

**B.**   **Plaintiff May Not Recover under the Insurance Policy Because the Application Contained Material Misrepresentations**

Furthermore, even if a policy had issued, plaintiff would be barred from recovery because the proposed insured's Application contained numerous misrepresentations and omissions.  Under Georgia law, misrepresentations, omissions, and concealment of facts and incorrect statements prevent recovery under an insurance policy if they are material either to the acceptance of the risk or to the hazard assumed by the insurer.   *See* O.C.G.A. § 33-24-7(b), (b)(2). Defendant contends that Herndon's Application contains a series of material misrepresentations regarding her medical history. Plaintiff, however, argues that her Application did not contain any material misrepresentations and/or omissions because she provided the name and address of the physician who treated her for various illnesses and medical conditions.  (Mem. in Supp. of Mot. for Summ. J. [21] at 2.)

10

AO 72A
(Rev.8/82)

Plaintiff prepared and physically handwrote portions of the Application with information provided by Herndon. Based on that information, plaintiff placed an "x" in certain boxes regarding Herndon's medical history. (Dalrymple Dep. at 49:11-50:14.) Plaintiff specifically recalled filling out Box 2 of the Application, which required plaintiff to place an "x" in a box indicating whether Herndon had been treated or diagnosed by a physician as having various illness/disorders in the past ten years. (Id.)

Plaintiff recalls indicating in Box 2 of the Application that Herndon had not been treated or diagnosed with a "[d]isorder of brain or spinal cord, paralysis, mental disorder, epilepsy, stroke, convulsions, chronic headaches" in the past ten years. (Id.; Pl.'s Resp. to DSMF at ¶ 9.) This representation was false as, according to Dr. Covington, Herndon was paralyzed. (Covington Dep. at 13:10-15.) Plaintiff argues that Herndon did not suffer from paraplegia, however, because "[s]he had feeling in her legs and some muscle control... underwent physical therapy to regain her ability to stand and wore leg braces." (Mem. in Supp. of Mot. for Summ. J. [22] at 2.) Unfortunately for plaintiff, Dr. Covington's, and not plaintiff's, diagnosis of Herndon's medical condition controls. According to Dr. Covington, during the time he treated Herndon, she was paralyzed, notwithstanding "some slight motion of a foot on either side." (Covington Dep. at 13:10-15.) Because Dr. Covington

11

treated Herndon from December 11, 2002 until her death, Herndon had been diagnosed with paralysis within 10 years of December 2003 or January 2004: the time period during which plaintiff and Herndon filled out the Application for insurance. Thus, the Application falsely represented that Herndon had not been treated or diagnosed with paralysis in the prior ten years. (Covington Dep. at 13:3-15; "Initial Visit Dictation" attach. as Ex. 1 to Covington Dep. at 1; "April 5, 2004 Medical Report" attach. as Ex. 13 to Covington Dep.; Dalrymple Dep. at 11:14-18; 14:6-18; 53:9-22.)

Likewise, despite the fact that plaintiff and Herndon provided information on the Application indicating that plaintiff had not been diagnosed or treated for a mental disorder in the past ten years, Dr. Covington testified that he treated Herndon for a mental disorder in early 2003. (Covington Dep. at 26:4-26:7 "Q. So at that time, she [Herndon] was--is it accurate to say she was being treated for disorders of the lungs, recurrent infections, and a mental disorder? A. I think that's accurate, yes, sir.") Plaintiff concedes that Herndon took medication for depression, but contends that her condition did not constitute a "mental disorder" because "neither she nor her son considered her sadness as a result of life's consequences constituted a mental disorder." (Mem. in Supp. of Mot. for Summ. J. at 2.) Again, plaintiff's diagnosis as to what constitutes a mental condition is not relevant. Based on the testimony provided by Dr.

12

Covington, Herndon's Application misrepresented her medical condition with respect to mental disorders.

Similarly, even though Ms. Herndon's Application indicates that she had not been treated or diagnosed with headaches in the past ten years (Application at 3), in 2002, Herndon complained of daily headaches.  (Covington Dep. at 15:3-10; "Initial Visit Dictation" attach. as Ex. 1 to Covington Dep. at 2 ("Does admit daily 'headaches.'")

The Application also indicates that Herndon had not been diagnosed or treated for "[a]sthma, bronchitis, emphysema, tuberculosis or other disorder of the lungs or respiratory system." (Application at 3.)  According to plaintiff's treating physician, however, Herndon had a history of emphysema.  (Covington Dep. at 20:25; "Discharge Summary Dictation" attach. as Ex. 7 to Covington Dep. (noting patient's "history of lung disease.")  Herndon also suffered from bilateral collapsed lungs.  (*Id.* at 12:8-19; Initial Visit Dictation attach. as Ex. 1 to Covington Dep. at 1.)  In October 2003, Herndon was also diagnosed with "respiratory distress requiring intubation and ventilatory support."  (Covington Dep. at 35:18-23; Discharge Summary attach. as Ex. 7 to Covington Dep.)  Plaintiff argues that Herndon did not answer incorrectly the question regarding whether she had been treated or diagnosed by a physician within the past 10 years for asthma or a disorder of the lungs incorrectly

13

because she did not fail to reveal any known lung disorder, and in fact, admitted that she was a smoker. (Mem. in Supp. of Pl.'s Mot. for Sum. J. at 2.) However, even if plaintiff admitted that she smoked, she did not answer in the affirmative the question regarding whether she had been diagnosed or treated with emphysema. Based on her treating physician's analysis that Herndon suffered from a history of emphysema and other respiratory ailments, Herndon's answer constituted a misrepresentation.

Although the Application notes that Applicant had not been treated or diagnosed with "Diabetes, recurrent infections, enlarged lymph glands, anemia, excess fatigue or other disorders of the glandular or blood systems" (Application at 3), Dr. Covington testified that Ms. Herndon had "recurrent urine infections that we think was [sic] related to her urinary catheter." (Covington Dep. at 54:21-22.) Likewise, Dr. Covington testified that his statement that Herndon "does have a Foley catheter that gets changed q. month but states she 'keeps a urine infection'" ("January 3, 2003 Home Dictation" attach as Ex. 2 to Covington Dep.) indicated that Applicant suffered from "recurrent urinary tract infections." (Covington Dep. at 17:7-10.)

Similarly, even though the Application has an "x" in the box stating that the Applicant did not suffer from "anemia" (Application at 3), Dr. Covington stated that Herndon suffered from anemia in

14

2003. (Covington Dep. at 33:10-12; "September 16, 2003 History and Physical Dictation" attach. as Ex. 6 to Covington Dep. at 3 "Anemia with type and cross 2 units of packed red blood cells.") Accordingly, Herndon's Application incorrectly indicates that she had not been diagnosed with anemia in the past ten years.

Based upon the above, the Court concludes that Herndon's Application for insurance contained numerous misrepresentations and/or omissions. Misrepresentations, concealment of facts, and incorrect statements do not act as a bar to recovery under an insurance policy, however, unless they are material to acceptance of risk or to hazard assumed by the insurer. *See* O.C.G.A. § 33-24-7(b)(2). A misrepresentation is material if it would influence a prudent insurer in determining whether to accept the risk or in fixing the amount of the premium in the event of such acceptance. *Brown v. JMIC Life Ins. Co.*, 222 Ga. App. 670, 671 (Ga. App. 1996). While ordinarily the jury decides the question of materiality, where evidence excludes every other reasonable inference except that of materiality, no issue shall be presented to the jury for its determination. *New York Life Ins. Co. v. Schneider*, 155 Ga. App. 768, 742 (Ga. App. 1980).

Here, the undisputed evidence indicates that defendant would not have issued Herndon a life insurance policy if an accurate description of her medical history had been provided. ("September

AO 72A
(Rev.8/82)

15, 2004 Letter re: claim denial" attach. as Ex. A to Tyson Decl. at A-1-2 "Furthermore, our review of Mrs. Herndon's medical history, essentially none of which was disclosed on the application, indicates that no insurance would have been issued under any circumstances... The Company would not issue any insurance to Ms. Herndon with the medical history she had.")

Plaintiff did not present any evidence refuting Tyson's statements. Indeed, it is obvious that no responsible insurance company would issue a life insurance policy to a person with the numerous and serious health conditions from which Mrs. Herndon suffered. Thus, no genuine issue remains as to the materiality of the misrepresentations in the Application. *Nappier v. Allstate Ins. Co.*, 961 F. 2d 168, 170 (11th Cir. 1992) (where plaintiffs did not offer any evidence contradicting defendant's evidence that misrepresentation was material and that Allstate would not have issued a policy had it known the truth, plaintiff failed to raise a genuine issue of material fact.) Because plaintiff failed to present any evidence refuting the materiality of the misrepresentations contained in the Application, these misrepresentations are material as a matter of law.

In addition, plaintiff signed a "declarations" page indicating that all statements and answers in the Application "shall be the basis of any insurance issued, and my (our) answers are material to

16

the decision as to whether the risk is accepted by Protective Life."
(Application at 4.)  Because the Applicant signed this declarations
page in connection with her Application, the misrepresentations are
material as a matter of law.  *See New York Life Ins. Comp. v.
Schneider*, 155 Ga. App. 768, 742 (Ga. App. 1980) (where policy states
on its face that unless all answers provided are complete and true
representations of the matters inquired about the policy shall not
take effect, and the policy required the disclosure of symptoms of
preexisting conditions, misrepresentations regarding symptoms of
preexisting conditions were material as a matter of law.)  Likewise,
here, where plaintiff declared that all statements and
representations in the Application were full, complete, true and
material, and the Application failed to disclose that Herndon had
been treated and diagnosed for multiple illnesses and conditions
specifically asked about on the Application, such misrepresentations
are material.

Plaintiff contends that because the declaration page containing
the acknowledgment of materiality was signed after the initial
application had been submitted, there was no consideration for this
subsequent declaration, and it cannot form part of the Application.
Specifically, A declarations page was signed with the initial
Application in December 2003 or January 2004.  However, defendant
requested that the Applicant sign a new declarations page.  (DSMF at

17

¶ 39; Dalrymple Dep. at 54:4-10.)  Plaintiff and Herndon signed the declarations page sent to them, and plaintiff mailed it back.  (DSMF at ¶ 40; Dalrymple Dep. at 55:15-19; 57:25-58:4.)  However, because the Insurance Policy had not issued, Herndon's signature on the substitute declaration page constituted consideration for issuance of the policy.

Plaintiff also argues that the declaration page cannot form a part of the Application because Herndon did not know what she was signing.  However, under Georgia law "'[p]arties to a contract are presumed to have read their provisions and to have understood the contents.  One who can read, must read, for he is bound by his contracts.'"  *Swyters v. Motorola Employees Credit Union*, 244 Ga. App. 356, 358 (Ga. App. 2000) (internal citation and quotation omitted).  Thus, plaintiff is bound by the contract Herndon signed.

Furthermore, even if Herndon acted in good faith or had no knowledge of the falsity contained in her Application, any material misrepresentation in the Application bars recovery.  *See* O.C.G.A. § 33-24-7(b)(3); *Nappier*, 961 F.2d at 170 (irrelevant whether applicant for insurance acted in good faith or had knowledge of the falsity when misrepresenting material fact when procuring insurance) (internal citation omitted).

18

## II.  **Plaintiff's Claim for Benefits under the Conditional Receipt Agreement**

Plaintiff also argues that he is entitled to recover an insurance benefit under the Conditional Receipt Agreement ("CRA") signed by his decedent.  The CRA provides a "limited amount of insurance, for a limited period of time...if all the terms and conditions of the [CRA] are met."  (CRA attach. as Ex. A to Tyson Decl. at A-8.)  Under the CRA, insurance may become effective prior to policy delivery if, among other things, "(A) on the Effective Date the Proposed Insured(s) is (are) insurable exactly as applied for under the Company's printed underwriting rules for the plan, amount, and premium rate class applied for...; (C) the "Proposed Insured(s) has/have completed all examinations and/or tests requested by the Company."  (*Id.*)  In addition, insurance based on the application will take effect on the latest of "(A) the date of the application; (b) the date requested in the application; or (c) the date of the last of any medical examinations or tests required under the rules and practices of the Company."  (*Id.*)

The plain language of the CRA makes clear that no coverage will issue prior to the performance of medical tests required by Protective Life.  Here, tests requested by Protective Life had not been performed by the time Herndon died.  (Tyson Decl. at ¶ 3; September 15, 2004 Letter re: Claim Denial attach as Ex. A to Tyson

19

Decl. at A-1.)   In a letter addressed to Mr. Dalrymple written by
Arthur Tyson, Senior Life Claims Specialist, Tyson explained that
plaintiff was not entitled to any benefits under the CRA because
"Mrs. Herndon died before the required paramedical examination, blood
profile, urine specimen, or EKG could be performed."   (*Id.*)
Plaintiff failed to present any evidence refuting defendant's
evidence that the tests required by the CRA had not been performed
prior to Herndon's death.   In addition, plaintiff sent a letter to
Protective Life in response to Tyson's letter denying benefits under
the CRA and Application.   ("October 27, 2004 Letter re: Protest of
Denial of Benefits" attach. as Ex. B to Tyson Decl.)   In his letter,
plaintiff admits that Protective Life's subcontractor did not perform
the required physical for Herndon before her death.   (*Id.*   "We spoke
to them [the subcontractor] on numerous occasions and they could
never seem to work out their schedule to meet with Mrs. Herndon and
complete the physical.")

    Because the required tests had not been performed by the time of
Herndon's death, no insurance issued under the CRA.   The Georgia
Court of Appeals interpreted a similar requirement in another
Protective Life CRA in the following manner:

> The 'effective date' in this case was the date of the
> last of any medical examinations or tests required under
> [Protective Life's] underwriting practices...The medical
> examination required by [Protective Life] had not
> occurred at the time [Plaintiff's decedent] died.   On

20

that 'effective date' the decedent was not 'insurable exactly as applied for under the...premium rate applied for' because on that 'effective date' the proposed insured was dead. Thus, under the terms explicitly stated in the conditional receipt, coverage was not effective prior to the issuance of a policy. As no policy was issued subsequently, no coverage existed. *See Protective Life*, 193 Ga. App. at 317.

Because the conditional terms of receipt--the taking of medical examinations--under which insurance might become effective prior to policy delivery, did not take place, plaintiff may not recover under the CRA.

### III. **Plaintiff's Bad Faith Claim**

Finally, the Court concludes that defendant appropriately denied plaintiff's claim for benefits, and, thus, dismisses plaintiff's bad faith claim. Under Georgia law, "[a] refusal to pay in bad faith means a frivolous and unfounded denial of liability. If there are any reasonable grounds for an insurer to contest the claim, there is no bad faith." *Swyters*, 244 Ga. App. at 358 (citation omitted). Because reasonable grounds existed for defendant's denial of benefits under the insurance documents, the Court accordingly dismisses plaintiff's bad faith claim.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant's Motion for Summary Judgment [15] AND **DENIES** plaintiff's Motion for Summary Judgment [22].

21

SO ORDERED, this 26 day of January, 2007.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)